UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

DOREEN YOO,

                                                   Plaintiff,

— against —

MORGAN STANLEY SMITH BARNEY
LLC AND IAN BERNSTEIN,

                                                   Defendant.

------------------------------------------------------------------------x

_____

ECF CASE

**COMPLAINT**

**JURY TRIAL REQUESTED**

Plaintiff, Doreen Yoo ("*Yoo*" or "*Plaintiff*") by her attorneys, Sack & Sack, Esqs., files the following Complaint against her former employer, Defendant Morgan Stanley Smith Barney LLC ("*MSSB*") and Ian Bernstein ("*Bernstein*" or together with MSSB, "*Defendants*").

Yoo, as and for her complaint, alleges as follows:

**NATURE OF THE ACTION**

1.      Plaintiff complains that Defendants, engaged in the unlawful discrimination and subsequent retaliation of Plaintiff in the terms, conditions, and privileges of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, ("*Title VII*") based upon her sex, female.

2.      Plaintiff further complains that Defendants engaged in the unlawful discrimination and retaliation of Plaintiff in the terms, conditions, and privileges of her employment in violation of New York State New York State Human Rights Law, Executive Law

§ 290 et seq. ("*NYSHRL*") and the Administrative Code of the City of New York § 8-101 et seq. ("*NYCHRL*") based upon her sex, female.

3.      Plaintiff files this action to seek monetary relief for the denial of equal employment opportunity and for the unlawful employment practices of Defendant.

4.      Plaintiff further complains that she has suffered, is suffering and will continue to suffer severe economic and non-economic damages because Defendant deprived Plaintiff of her employment rights in violation of federal and state law.

5.      Plaintiff filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("*EEOC*"), which bore charge number 846-2012-74007.

6.      Plaintiff timely brings this action within ninety (90) days of the receipt of a Notice of Right to Sue Letter ("*NORTS Letter*"), issued by the EEOC on March 17, 2015.

7.      Furthermore, Plaintiff is owed at least eighty five thousand (**$85,000**) concerning her earned and unpaid 2011 Bonus.  Plaintiff's entitlement to her 2011 Bonus is supported by:

   a. The parties express agreements;

   b. Numerous express promises and representations made expressly by MSSB and relied upon by Plaintiff, which were made by those agents of Respondent in authority during the course of her employment;

   c. MSSB's legal obligation to obey the implied covenant of good faith and fair dealing.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  In

addition, the Court has jurisdiction over Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

9.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a).  Venue in this matter is properly laid in the District because the violations of the Plaintiff's federal and state civil rights occurred during the course of their employment at branch office locations in this District, because the Defendant does business in this District, and because most of the fact witnesses and evidence are common to or most convenient to this District.

10.     Plaintiff served copies of this Complaint upon the New York City Commission on Human Rights and the New York City Corporation Counsel prior to filing it in the United States District Court.

**PARTIES**

11.     Plaintiff is an individual who, at all times relevant to this Complaint, resided at 415 5th Street, East Northport, NY  11731.

12.     At all times relevant herein, Plaintiff was an "employee" within the meaning of 42 U.S.C.A. §§ 2000e, et seq., § 296 of the NYSHRL and under § 8-102(1) of the NYCHRL and thus, afforded protection against sexual harassment and discrimination and retaliation in employment on the basis of her sex, female.

13.     At all times relevant to this Complaint, Defendant is a corporation licensed to do business in the State of New York, with offices located at 1585 Broadway, New York, New York 10036.

14.     At all times relevant herein, MSSB is an "employer" within the meaning of 42 U.S.C.A. § 2000e-(b), § 292 of the NYSHRL and under § 8-102(5) of the NYCHRL.

15.     At all times relevant herein, Bernstein, a Managing Director, was MSSB's Head of Business Development and resides at 7 Oakwood Court, Towaco, New Jersey, 07082

## FACTS COMMON TO ALL COUNTS[1]

The claims set forth herein arise from the following set of facts:

### YOO'S BACKGROUND AND EMPLOYMENT HISTORY

16.     Yoo began her MSSB professional career in 1990 under the company name Dean Witter Reynolds.  Yoo was hired to work in the Fixed Income Division, as a Fixed Income Bondline Liaison.  Yoo was the only female employee out of the 20 Bondline employees.

17.     Yoo remained a loyal and dedicated employee even after personally experiencing the horrors of both the 1993 World Trade Center bombing and the 9/11 tragedy at her workplace at 2 World Trade Center, 60th Floor, NY, NY.  Yoo remained steadfast during the period of unsettling transition, including several office relocations that took place directly after the attacks.

18.     Eight months after Yoo was hired, she transferred out of Bondline to work on the retail Mortgage Backed Securities ("*MBS*") Trading desk as an assistant trader.  From 1990 to 1993, Yoo worked on that desk with the expectation of eventually being promoted to a trading position.

19.     In or around July of 1991, a trading position finally did open up, but Yoo was never given the opportunity to interview, or be considered for the position.  Mark Sheehy, who did not have his Series 7 license at that time, was hired instead (Sheehy was eventually promoted to Managing Director in December of 2007 and Head of Credit Sensitive Trading in April of

---

1. All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

2010). Yoo was more than qualified to fill the trading position and was already Series 7 registered. Her duties on the desk remained strictly clerical in nature.

20. In or around November 1993, Yoo was offered a trading position in a different department on the Managed Accounts Trading Desk. Yoo took the offer and became part of a three-member team, which included two traders and one assistant. The team was responsible for trading fixed income securities for fee-based accounts on an agency basis.

21. Yoo's responsibilities as a Managed Accounts Trader were to execute fixed income trade orders on behalf of external money managers. The Managed Accounts trading desk was located on the same floor as the Fixed Income Division, but reported into and were part of the Investment Consulting Services ("*ICS*"), not Fixed Income.

22. In March of 1999, Yoo's partner, Sean Joy, resigned and Yoo was promoted to Desk Supervisor. During her first ten years at MSSB, Yoo was a superior performer, receiving periodic promotions and minimal increases in compensation, despite various discriminatory practices described later.

23. Shortly after 9/11, ICS reorganized the department and hired Greg Gesslein who would be Yoo's new manager.

24. In June 2003, Yoo sold her home in Ossining, NY and moved to Carmel, NY. Yoo made this decision after Gesslein told her that her team would be relocating to Purchase, New York within the following year. Carmel is located 40 minutes North of the Purchase Office.

25. On November 4, 2003, five months after Yoo moved to Carmel, she was diagnosed with stage III breast cancer, and on November 25, 2003, in which she was forced to have a mastectomy. Yoo was placed on medical leave due to chemotherapy and radiation treatments until July 2004.

26.     In or around December 2003, still home on medical leave, Yoo received a call from Gesslein and was told that Yoo was promoted to Vice President.  Her 2003 year-end total compensation was only $78,800 and reflected no significant changes. Her compensation was actually $10,000 less than the year before in year-end 2001 and approximately $23,000 less than in year-end 2000.

27.     During the same conversation, Gesslein told Yoo that she and her team were not being relocated to the Purchase office, but would be moving to Harborside, New Jersey. This would add an extra hour to her commute each way. Although the Harborside office move would make it extremely difficult for her to travel back and forth to work and as a sign of her dedication, Yoo had every intention of returning back to work as soon as she was able.

28.     In and around March of 2004, the Managed Accounts desk relocated to Harborside, New Jersey.  The following month, Gesslein hired another trader, James Grandinetti. Gesslein paid Grandinetti the same base pay as Yoo, even though Grandinetti was her direct report.

29.     In and around April 2004, still home on her medical leave, Yoo received a phone call from Ian Bernstein, a Managing Director from the Global Wealth Management Fixed Income Division.  He told her that the Compliance department, from a risk perspective, had made the decision to realign the Managed Accounts Fixed Income team. They removed them from ICS and immediately reported into Global Wealth Management Group's ("*GWMG*") Fixed Income Trading department.  Bernstein told Yoo that she and her team would be relocating back to the Purchase, New York location as originally planned.

30.     Bernstein also informed her that the Managed Accounts desk would no longer be reporting into Gesslein, and would now report directly to him, under the GWMG Fixed Income starting in August 2004.

31.     In and around July 2004, Yoo returned back to work in Purchase and began reporting into the Fixed Income Division.  Yoo's team remained at the Harborside, New Jersey location and was expected to re-join her in Purchase the following month.

32.     In and around September 2004, Bernstein told Yoo that she would be taking on more responsibilities and would oversee the Custom Portfolio Managed Accounts Fixed Income Trading program in addition to the discretionary programs that Yoo had already been managing. This program was the fastest growing fee-based program within all of the ICS's platforms. Yoo was told that she could add additional traders to her team.

33.     At the same time, Bernstein told Yoo that she would be taking over Morgan Stanley's Private Wealth Management ("*PWM"*) Discretionary Taxable Fixed Income trading business.  The PWM business provides highly customized financial advice, investment solutions and brokerage services to high net worth individuals, families and foundations with $20 million or more in investable assets.

34.     In and around the end of September 2004, Bernstein said that he was looking for someone to head her desk.  Yoo replied,  "**But I'm already the Head of the desk.**" Bernstein replied, "**This is a much bigger role and there are two other people also in competition for the position.**"

35.     Yoo competed for the position and was given the title "Head of Managed Accounts Fixed Income Trading."  Yoo had been delegated a significant amount of increased responsibilities, without a significant increase in compensation or change in title.

36.     On October 3, 2004, Bernstein sent the following announcement out to all of Capital Markets, ICS's internal and external money managers, and the firm's branch offices:

> ***"I am pleased to announce that Doreen Yoo has assumed the position of manager of fixed income discretionary/managed account trading.  In this new role, Doreen and her team will be responsible for handling all retail fixed income transactions on behalf of clients in Access, Vision, PPA and Custom Portfolio.  Additionally, Doreen's group will be handling transactions for broker exercised discretionary accounts on the PWM platform.  Doreen will report directly to her.***
>
> ***In this time of increasing regulatory and compliance interest in fixed income trading in general and managed fixed income transactions in particular it is important that we commit in a visible fashion to the resourcing this critical function requires.  Doreen and her team will focus on delivering the technology, market intelligence and execution capabilities we require in the managed fixed income space going forward.***
>
> ***Please join me in congratulating Doreen on her new role."***

37.     In and around November 2004, Yoo was told by Compliance by email that as per NASD Rule 1021, any employee of a member firm serving in a supervisory capacity is required to have a principal license.  Yoo was given three months to take and pass the Series 24 General Securities Principal License exam.

38.     Eight other senior trading and sales executives, who had supervisory responsibilities, were told that they needed to take the exam.  These executives were:  Kevin

Morano, Managing Director; Thomas O'Brien, Managing Director; Joseph Colleran, Managing Director; Mandell Crawley, Executive Director; Adam Topalian, Executive Director; Josh Zucker, Executive Director; James O'Brien, Vice President; and Mark Landers, Vice President.

39.     On February 4, 2005, Yoo took and passed the Series 24 exam.

40.     Yoo's 2004 year-end total compensation was only $93,400 (base pay of $70,500 and year end bonus of $22,900).  Her compensation was much lower than her male colleagues who were managers and not competitive to what the street was paying for similar supervisory rolls at other firms.

41.     In and around the beginning of 2005, Yoo discussed her low compensation with Bernstein.  Bernstein decided to give her an additional $25,000, but it was not reflected in her base pay or bonus.  Bernstein agreed that her compensation was below what he thought she should be paid but said "**we can't fix these things overnight.**"

42.     After receiving a substandard bonus, Yoo decided to put herself in a better position for career advancement.  Yoo started proactively studying for other FINRA security exams that management would most likely require her to obtain in the future.

43.     On April 13, 2004, Yoo took and passed the Series 9 General Securities Sales Supervisor Principal License.

44.     On May 9, 2005, Yoo took and passed the Series 10 General Securities Sales Principal License.

45.     On July 16, 2005, Yoo took and passed the Series 53 Municipal Securities Principal License.

46.     On September 2, 2005, Yoo took and passed the Series 55 Equity Trader License.

47.     In and around July 2005, Bernstein asked her to hire Geoffrey Dennehy. Dennehy was a Vice President who had over 25 years experience working on the principal Municipal trading desk.  Yoo agreed that Dennehy would add value to her team, so she hired him to primarily trade municipal securities for their fee-based programs. Her team was growing and Yoo now had experienced traders who specialized in select products.

48.     Yoo's 2005 year-end bonus was $89,000, with a base salary of $76,000 (total compensation with the extra $25,000 payment given to her was $190,000).  Again, Yoo was not promoted to Executive Director even though she was given much more responsibility.

49.     Yoo had recommended that her most senior trader, Paul Allende, one of the few Hispanic minorities working in Capital Markets, be promoted to Vice President.  Her request was denied, despite Allende's excellent year-end reviews and his role as a leader on her team.

50.     In 2006, Yoo's year-end bonus was only $85,000 with a base of $105,000 and Long Term Incentive compensation of $9,500. Yoo was paid the same base pay as two of her male traders who reported into her.  Though her bonus had a higher percentage increase than the year before, the increase in percentage calculation never included the extra $25,000 payment that was given to her in 2005.

51.     Again, Yoo did not receive a promotion year-end 2006, yet her job responsibilities kept increasing year after year.

52.     In or around January 2007, Yoo met with Cheryl Palmerini who was her Human Resources representative at the time, to evaluate compensation for her team and herself Palmerini told her, "**Doreen, you need to start thinking of packaging out your staff**

**down the road since you have some older employees over 50 on your desk.**"

Yoo was uncomfortable with this comment, especially since Yoo was 47 at that time.

53.     In June of 2007, Bernstein told Yoo that she would be acquiring the Private Wealth Management ("*PWM*") Municipal Trading business.  A few months after that, Yoo hired two more traders, John Frole and Demetrios Imprixis.

54.     On December 23, 2007, after three years of officially heading the Managed Accounts desk, Yoo was finally promoted to Executive Director.  At the same time, Grandinetti was also promoted to Vice President.

55.     Yoo's 2007 year-end bonus was $121,500 with a base of $115,000 and Long Term Incentive compensation of $13,500.  Her total compensation was $250,000, which was believed to be much lower than the other male Executive Directors and trading desk managers within GWMG Capital Fixed Income at that time.

56.     In or around June of 2008, Grandinetti resigned.

57.     Yoo's 2008 year-end bonus was only $70,000 with a base pay of $125,000 and no Long Term Incentive compensation.  Total compensation was $195,000, which was actually down $55,000 from the prior year.  Yoo spoke to Bernstein and said to him "**I understand it was a bad year, but my compensation is the same as it was when I was just a Vice President.**"  Bernstein replied, "**Anyone who doesn't like their bonus is free to leave**."  Yoo replied, "**I already have traders starting to leave.**"

58.     In or around September 2009, Bernstein told Yoo that he had initiated compensation discussions with HR for her and her team in an effort to have Yoo back off asking for further salary increases.

59.     Yoo contacted Bernstein several more times to follow up and asked if he had heard anything back from HR regarding her team's compensation.  Bernstein told her he had not.

60.     On January 12, 2010, Yoo sent Bernstein a follow up email but never received a response.

**JOB DESCRIPTION AND PERFORMANCE REVIEW**

61.     As Head of the Managed Accounts Trading Desk, Yoo was responsible for a team of nine direct reports who traded taxable and tax-exempt securities for MSSB's multiple fee-based programs.  These trades were executed on an agency basis (with another dealer outside of MSSB).  Coverage included over fifty primary and regional dealers nationwide.

62.     Yoo had over nineteen years of experience working with managed accounts, and provided account liquidity for over 100 Separately Managed Account portfolio managers as well as for over 6,500 internal asset managers for MSSB's Private Wealth Management and Separately Managed Accounts programs.  Total fixed income assets under management in these programs were approximately $36.5 billion. Despite her stellar and dedicated efforts, Bernstein's several flaws as an absentee manager had a severe impact on MSSB's ability to promote and develop her team.  He did not provide Yoo with the resources she needed to keep up with the increase of trade flow, nor extend the same professional courtesies that he had given to her male colleagues.  Requests for additional system enhancements for her team were routinely ignored.

63.     In 2009, Yoo's total managed account trade volume increased significantly:

  a.     Total trade volume for Fixed Income Managed Accounts tripled from 2007 to 2009;

  b.     Private Wealth Management increased 86% from 2008;

12

    c.      Custom Portfolio increased 76% from 2008;

    d.      MS Advisory increased 31% from 2008;

    e.      Personal Portfolio increased 77% from 2008.

64.    The Managed Accounts desk was not a "profit center" for the Fixed Income Division, but it did contribute to MSSB generating millions of dollars in revenues from fees that were charged quarterly on accounts within their programs.

65.    The Consulting Group (CG, formally ICS), in turn, gave Bernstein part of these fees each month to cover the cost of what was needed to run and support her desk. This undisclosed amount was to include an allocation allotment for Yoo's team's compensation.

66.    Over the years, Yoo had successfully developed her team into a desk that was respected and received high marks from MSSB's top producing Financial Advisors. Several of these FA's have made the list of Barron's "Top 100 Financial Advisors". Yoo received numerous emails regularly from internal and external managers, regarding the exceptional quality of service that she and her team had provided. Some of these FA's at the same time complained to senior management as to why other trading desks in Capital Markets weren't providing the same competitive pricing levels and service that Yoo's desk provided.

67.    Over the years, Yoo successfully improved the quality of trade executions through a continued expansion of dealer coverage and established guidelines and procedures for all new dealer and manager relationships

68.    Yoo was chosen to be part of a MSSB task force developed to transition legacy Smith Barney Financial Advisors and their accounts over to the Morgan Stanley platform.

69.     Bernstein rarely included Yoo in meetings with other GWMG Capital Markets senior management, but she regularly collaborated one-on-one directly with the CG's business owners in an effort to implement and effectively rollout innovative managed money programs to support new business demands.   Some of these initiatives included the launch of Personal Portfolio and MS Advisory.

70.     As a trading desk manager, Yoo had the same managerial responsibilities and requirements that the other male desk managers within Capital Markets had performed.   Some of these duties included:

- Staff Supervision
- Daily Sign Off T+1 reports
- Daily Sign Off on Negative Yield Reports
- Daily Sign Off Sales Credit/Commission Recap reports
- Sign Off and approvals on trade error reports
- Email Surveillance for direct reports
- Monitor non-cash compensation activity
- Managing Risk Controls
- Participate on weekly MSRB/TRACE summary calls to monitor late trade activity
- Maintain Vendor relations
- Update and enhancements of policy and procedures
- Goal development for staff
- Mid year and year-end staff reviews
- Employee pre-clearance trade approval
- Hiring and Interviewing potential new staff
- Finra Principal Licenses:  General Securities Principal, Series 24 and Municipal Securities Principal, Series 53, Series 9 and 10, General Securities Sales Supervisor

71.     In addition, Yoo introduced new ECN's (Electronic Communication Networks) and trading systems, which dramatically improved productivity and efficiencies.   Yoo implemented and monitored trade risk controls for all ECN's used by her trading team.  Yoo met monthly with ECN sales coverage to insure current systems were up to date with changing regulatory environment.

72.     Yoo participated in important innovations for the managed accounts desk, including assisting in the design and implementation of the desk's Unified Trading System ("*UFI*"), an online order system that consolidated five of MSSB'S managed account programs. UFI automated trade flow and reduced desk trade errors that were caused by manually inputting trades.

73.     Over the history of her employment with MSSB, Yoo received excellent mid-year and year-end reviews.

74.     For example, Bernstein wrote in Yoo's last year-end review given in 2010, "**Overall Rating: Exceeds Expectations**."

<strong>COMPLAINTS OF A HOSTILE WORK ENVIRONMENT AND DISPARATE PAY AND MSSB'S FAILURE TO RESPOND</strong>

75.     Yoo had an office in addition to a seat on the trading desk with her staff situated next to Ronald Rimmer ("*Rimmer*"), Head of the Infrastructure team.  Yoo expressed concern on numerous occasions to Bernstein about Rimmer's loud and inappropriate phone etiquette and use of threatening language.

76.     Rimmer would often make comments over the phone such as "**I'm going to blow your fucking head off**" and "**I'll come over there and kick the shit out of you.**"

77.     Yoo told Bernstein that she had many years of experience working on a trading floor and often heard inappropriate language, but felt that Rimmer was putting the firm at risk by continuing to behave unprofessionally over the phone, especially since he could never be sure of

who else might be listening on the other end to the conversation.  Yoo also told Bernstein that her own customers had complained about overhearing Rimmer's inappropriate language in the background when she was on the phone with them and that his behavior was making her embarrassed and uncomfortable.  Bernstein dismissively replied, "**I'm sure you've used bad language before Doreen."**

78.    Shortly after her complaint about Rimmer, Bernstein told Yoo that she would now be sharing her office with Rimmer himself.

79.    In January of 2010, Yoo tried to meet with Bernstein on several occasions, but Bernstein repeatedly canceled the meetings.  Bernstein, without notice, also removed their regularly scheduled bi-weekly meetings from the calendar.

80.    On January 12, 2010, Yoo sent Bernstein an email asking if he had heard anything back from HR regarding compensation for her team.  Bernstein ignored her email and never replied back.

81.    On March 18, 2010, Yoo made an appointment with Marc Howard, Yoo's HR representative. Howard was unaware of compensation discussions between HR and Bernstein for Yoo and her team.  Howard told Yoo that she needed to discuss the matter with Bernstein.  Yoo replied, "**I think Ian Bernstein is a large part of the problem and I don't think my team and I are being compensated fairly**.  **The men who head other trading desks are getting paid more than I am without any reason.  My performance is on par or better than theirs but I get paid less.  I don't understand why.**"

82.     Yoo asked Howard to pull compensation records and compare her salary with her other colleagues in GWMG Capital Markets who headed trading desks (who were all male) as well as with the other managers who had the same supervisory responsibility within the department.  Yoo pointed out that there were very few women working in GWMG Capital Markets, especially in trading and sales and that all the Managing Directors and Division Heads located on the floor were men.

83.     Yoo also told HR that she had hit a glass ceiling and the only advancements within the department were being offered to less qualified men.

84.     Capital Markets management has continued to promote a discriminatory work place practice of hiring mostly male employees and then placing them in positions with the greatest income and growth potential.   Women, including Yoo, were not given the same opportunities for advancement.

85.     Three quarters of approximately 400 employees in Capital Markets were male. At the time of her employment at MSSB, Yoo was the only woman manager running a trading desk in GWMG Capital Markets Fixed Income.

86.     In 2008, there were six employees promoted to Executive Director, and they were all men.  And only two out of the fifteen who were promoted to Vice President were women. Not one woman in GWMG Fixed Income department received a Managing Director or Executive Director promotion that year-end.

87.     The GWMG Capital Markets 2009 year-end promotion announcement showed that no women received Executive Director promotions, yet ten men were promoted.

17

88.     Only three of the twenty employees who received a Vice President promotion were women.  Also, despite increased profits and continued expansion within the fee-based business, not one person on her team had received a promotion that year.

89.     The Capital Markets 2010 year-end promotion list showed that no women received a Managing Director promotion yet two men were promoted.  Only two out of the twelve Executive Directors promoted were women.  Twenty-four employees were promoted to Vice President, but only four were women.

90.     The pattern of promoting men had continued for year-end 2011.  There were thirteen employees promoted to Executive Director, but only one was a woman.  Twenty-two employees were promoted to Vice President, but only four were women.

91.     At the time that Yoo was terminated, January 6, 2012, a male managed every fixed income trading area.  Only four, including Yoo, out of the fifty-five employees employed in fixed income trading were women.  And, two of the other three women, Meagan Rothschild, and Taylor Nelson, held only a Vice President officer title.

92.     While Yoo was employed at MSSB, the GWMG Capital Markets fixed income trading desk did not have any women in the following areas:

- Agencies
- Mortgaged-Back Securities
- Governments
- Finance Desk
- Precious Metals
- Whole Loan Trading
- CDs/ARPS
- FX
- Structured Investments Equities
- Structured Investments Fixed Income
- Futures
- Municipals San Francisco

18

- Municipal Syndicate
- High Yield
- Preferred Securities
- Convertibles

93.     The following three areas in trading only had two women working on the desks:

- Zero Coupon Bonds - Meagan Rothschild, Vice President
- Corporates – Taylor Nelson, Vice President
- Municipals New York – Nicolle Brescia

94.     Upon information and belief, at all relevant times, all of the highest paid employees in the GWMG Capital Markets Division were men despite Yoo's equal or better performance.  Defendants have no reasonable justification as to why Yoo was less compensated than her similarly situated male colleagues.

95.     On March 29, 2010, Howard scheduled a follow-up meeting with Yoo and his manager, Limor Wiener.  Wiener, who was busy online buying shows at her desk on the Zappos website, apologized for "**dropping the ball**" on the compensation discussions and for not getting back to Yoo sooner.  Yoo asked Wiener to keep their conversation confidential.  Wiener agreed and told Yoo that she would look into her complaint further.

96.     Shortly after the March 29, 2010 conversation, Wiener disregarded Yoo's confidentiality request and reported their conversation with Bernstein.

97.     On April 5, 2010, shortly after Yoo first filed a complaint with HR regarding unfair pay for her team and herself, Bernstein told her that because he had done a bad job at managing and supervising her desk that she would no longer be directly reporting to him but instead to another manager within the department. Bernstein created a "layer" between Yoo and himself generating even more of a communication barrier.

19

98.    On April 13, 2010, Yoo met with Wiener to go over her team's compensation, with the expectation that HR was going to address the disparity.  Yoo attempted to schedule follow up meetings, but Weiner cancelled them.

99.    A Capital Markets announcement was made on April 9, 2010 stating Bernstein would lead Capital Markets Infrastructure with responsibility for third party distributions, technology, Risk Management, Funding, Quantitative Modeling and Marketing Communications.   Even though Managed Accounts was considered trading, Yoo's desk remained under the supervision of Bernstein in the "Risk and Infrastructure" division.

100.    On April 20, 2010, Bernstein once again told Yoo that she would be taking on another new Advisory product.  This program involved trading internally with the principal fixed income desks.  The planning required Yoo to attend multiple meetings with the Advisory group, Operations, Legal and Compliance.  Additional staff for Yoo's team was projected at the time of product launch.

101.    In or around May 2010, in retaliation to her complaints to HR, Bernstein carefully orchestrated a scheme to hire Citigroup's Managed Accounts desks and only include this select trading group in MSSB's joint venture.   This plan involved five employees from Citigroup's Managed Accounts Desk, including the desk manager, Ron Piekarz.

102.    Bernstein's strategy was to have Piekarz replace Yoo when the time was right. None of the Citigroup traders were originally supposed to be part of the MSSB joint venture. The majority of Citigroup's traders were remaining at Citigroup.

103.    On May 20, 2010, Bernstein sent an email announcement regarding the Citigroup traders and also mentioned that he was planning to move Yoo and her team off the second floor, down to the 1st floor away from the other trading areas.

104.    Realizing the Head of Citigroup's Fixed Income Desk, Ronald Piekarz, was included in the five joining her team, and only one desk manager was needed, Yoo immediately felt that she was going to be quickly replaced and emailed Bernstein back asking if Piekarz would be reporting to her as manager of the desk.

105.    When Yoo didn't hear back from Bernstein, Yoo sent another email, asking if he could put a date on the calendar to discuss the issue.  Again, Bernstein never responded.

106.    Concerned Bernstein was trying to replace Yoo with Citigroup's Managed Accounts Desk Manager, she met with Bernstein unannounced and expressed her concerns regarding the Citigroup traders joining her team.

107.    Yoo asked Bernstein if she could start interviewing candidates for the new positions and include the Citigroup traders in the process. Bernstein told Yoo "no" and that she needed to be more flexible and look at the bigger picture.

108.    Piekarz, because of the long commute, ultimately decided to stay behind and remain at Citigroup, but Citigroup still intended on sending the remaining four of their fixed income managed accounts traders over to join Yoo's desk.

109.    On October 20, 2010, an email was sent from Michael Hennessey, Managing Director detailing the individuals targeted for contribution to join our team along with their current compensations: Tim O'Sullivan, Louis Lobasso, Forrest McNeil, and Mark Maier.

110.    Shortly after, Yoo learned that Citigroup's fixed income trader, Maier, was re-directed to work on the equity desk instead of her desk and that Citigroup was replacing him with equity trader Daniel Mannion.  Mannion's total compensation was $220,000, which was more than what Yoo was currently being paid.  He would be the highest paid on the desk, even

though he would be Yoo's direct report.  Mannion's background was in equities, and he had only a limited amount of fixed income experience.

111.    Upon information and belief, Bernstein put Mannion on Yoo's team as a favor to Citigroup's management because he resided in Greenwich, CT, a few miles from MSSB's Purchase office.

112.    Hennessy's email also disclosed that another one of the trader's joining her team, McNeil, had a total compensation of  $200,000, which was approximately what Yoo was paid.

113.    On August 20, 2010, Yoo asked James Jesse ("*Jesse*"), a Managing Director, and the COO of Strategy and Business Development, if Yoo could spend some time with him to discuss compensation and promotions for her team as she felt she was getting nowhere with Bernstein.  Jesse was also on the Capital Market's Promotion Committee.  Yoo told Jesse that she wanted three of her traders promoted; Geoff Dennehy to Executive Director, Paul Allende to Vice President and Banke Tung to Vice President.  Yoo provided documentation and explained in detail as to why.  Yoo discussed the meeting in detail with Bernstein immediately after it had taken place.

114.    During the conversation, Jesse agreed that he thought her team had compensation issues and admitted that he thought Yoo's compensation was extremely low and needed to be reviewed.  In addition, Jesse asked Yoo, **"Why is your team reporting into Risk? You and your team would be better off reporting into one of the trading areas instead of Bernstein's group."**

115.    Jesse also told Yoo that GWMG Capital Markets was in the process of restructuring compensation across the department and that her desk would be included.

116.    Yoo's 2010 Year End bonus was $20,400 with a base of $176,000 and Long Term Incentive Compensation of $3,600. Her total compensation was $200,000, the same total compensation that Yoo had in 2006 when she was a Vice President.  Furthermore, Bernstein excluded her and never asked for her input when he decided her trader's year-end bonuses that year.  Upon information and belief, Bernstein requested input from Yoo's male counterparts for their input in their traders' year-end bonuses.

117.    In and around January 2011, Yoo added another trader and transferred in King Wong from another trading desk on the floor.

118.    In and around the Spring of 2011, GWMG Capital Markets reorganized compensation for trading and sales.  Total compensation was supposed to remain the same, with an adjustment increase in base pay, and a decrease in year-end bonuses.  This adjustment gave more protection to an employee's total compensation when revenues are down.  The majority of GWMG Capital Markets traders had their compensation adjusted, but Yoo was told by Bernstein that she and her traders would not be included in the adjustments.

119.    In and around May 2011, Yoo hired Julia Babiitchouk in an effort to bring more women onto the trading floor. Before hiring Babiitchouk, Bernstein told her to do extra background checks on her by calling other dealers on the street to see what they thought of her. Bernstein had never asked her (or any of her male counterparts) to do extra background checks on any of the male traders Yoo had previously hired.

120.    On July 20, 2011, MSSB announced firm wide layoffs, and Bernstein terminated Yoo's trader, Demetrios Imprixis.  Yoo asked Bernstein if she could keep Imprixis instead of taking on one of the Citigroup traders expected to join her team the following year, since they were not originally part of the MSSB joint venture.

121.   Bernstein said **"no"** with no explanation.   Imprixis was the first casualty in Bernstein's master plan and was making room for the 4 traders scheduled to move over from Citigroup.

122.   In and around the Summer of 2011, Bernstein moved Yoo and her team off of the second floor, down to the first floor, along with Marketing, IT, Risk and Infrastructure.   Her desk was isolated from all the other fixed income trading desks. Not one other trading desk was moved downstairs.   Yoo and her team were also removed visibly from senior management. Every other trading desk manager, and their traders, who were coincidentally all men, remained together upstairs.

123.   Bernstein placed Yoo in a shared office with Rimmer again, knowing she was uncomfortable with his inappropriate behavior.   Yoo asked for an office change, but Bernstein refused her request.

124.   On August 26, 2011, Yoo scheduled a meeting with Michael Armstrong, Head of Capital Markets to discuss staff promotions and compensation for her team.   Armstrong was surprised to learn that her desk would be acquiring 4 of Citigroup's traders and he asked her "**Who did this?   Citi's traders were not part of the MSSB joint venture.**" Yoo told Armstrong that Bernstein initiated the discussions with Citigroup's management.

125.   When Yoo told Armstrong what the Citigroup traders were being paid, he angrily replied, **"Ian (Bernstein) shouldn't have done this. We will probably have to lay them all off down the road.**"

126.   On November 20, 2011, Yoo contacted Bernstein regarding a repeated problem she was having with one of her traders, King Wong.   Wong was assigned to trade municipals

24

securities and was told by Yoo on several occasions not to trade other products.  Wong lied to Yoo about several taxable trades he had done.  Yoo gave copies of emails and trade tickets to Bernstein who agreed to talk to Wong.

127.    Yoo wanted to have the incidents officially documented, so she contacted Paige Massie, who was her current HR representative, and set up a meeting with her the same day.

128.    The following day, Bernstein pulled Yoo into an office and reprimanded her for contacting HR.  He said, **"Why did you contact HR?  Now they are looking to terminate King."**

129.    Yoo told Bernstein **"I didn't want to fire him, I just wanted this incident documented."**

130.    After Yoo spoke with Bernstein, Yoo called Massie and explained to her that she didn't want Wong fired at this time, and that she only intended to document the incidences.

131.     The next day Bernstein again pulled her in an office and said "**You are stirring up the pot.  Stop calling HR**". Bernstein then told her  "**Do not discuss anything with HR from this point forward."**

132.    In or around the beginning of December 2011, Julia Babiitchouk had asked to speak with Yoo privately to discuss a problem.  Babiitchouk told her that one of Yoo's traders, John Slaight, a married man with three children, was sexually harassing her.  Babiitchouk told Yoo that Slaight was making her extremely uncomfortable by sending her non-work related emails and calling her on her cell phone during and after business hours.  Babiitchouk told Yoo that Slaight had told her that said he was attracted to her.  Babiitchouk then gave Yoo copies of

the emails/texts and a handwritten note that Slaight had sent her.  Babiitchouk told Yoo that she

didn't want her to discuss this with anyone, but Yoo told her that it would be in her best interest

if Bernstein became aware of the problem. Babiitchouk then agreed.

133.    Dennehy, who was seated next to Slaight and Babiitchouk, pulled Yoo aside and

told her that Slaight had been harassing Babiitchouk on a regular basis.  Yoo told him she was on

her way to discuss the situation with Bernstein.

134.    Yoo immediately reported the incident to Bernstein and discussed the problem in

detail.  She gave him copies of the emails and letters Babiitchouk had given her.  Yoo also gave

Bernstein copies of other inappropriate emails generated from Slaight

135.    Bernstein then met with Babiitchouk and Slaight separately to discuss the incident

further. The following day, Bernstein moved Slaight a few seats away from where he was

originally sitting, next to Babiitchouk.

136.    Yoo thought it would be best if Bernstein reported this to HR instead of her.

Because of the strong reaction Bernstein had with Yoo over Wong a few weeks prior, she

thought she would be fired if she were to report it herself.

137.    This was not the first time Yoo had gone to Bernstein with a complaint regarding

Slaight. Yoo was involved in a similar situation involving Slaight back in 2008, which was

affecting his job performance.  At that time, Slaight had more trade errors than anyone on Yoo's

team.

|   |      |            |
|---|------|------------|
| * | 2011 | $18,088.42 |
| * | 2010 | $17,297.10 |
| * | 2009 | $ 8,894.80 |
| * | 2008 | $95,937.59 |

138.    Yoo had discussed these problems regarding Slaight on several occasions with Bernstein.  Bernstein said to her, "**Doreen, you have more to lose over this than John (Slaight) does because you are his manager.**"

139.    On December 15, 2011, Yoo's trader, Alan Geng, told her he was resigning. Geng told her that Bernstein had cut his compensation in half over the years, and that he had found a better job paying more inline with what he felt he deserved.    When Yoo informed Bernstein that Geng was leaving, Bernstein said that the firm would be having layoffs.

140.    Shortly after Geng resigned, Yoo walked into Bernstein's office to find out more about the upcoming layoffs he had mentioned. Yoo asked Bernstein why he hadn't discussed layoffs with her prior to Geng's resignation and asked him if any of her traders, specifically Slaight and/or Wong, were on the termination list since they both recently had separate disciplinary issues.

141.    Bernstein sat back in his chair and sarcastically said, "**Okay Doreen, who do YOU want to put on the list?**"

142.    Yoo replied, **"Ian, you have always had pre-layoff discussions with me even if it didn't concern my desk.  Since you haven't done this, I feel that you put me on the list."**

143.    Bernstein replied nervously with his hands shaking**, "I'm not saying you are on the list and I'm not saying you're off the list.  Management is looking at officers across the board."**

144.    Yoo told Bernstein, **"I love my job and I have put a tremendous amount of effort building my desk and developing my team.  The fixed income fee based business is an area that will be growing from 15 billion in assets to over 45 billion within the next few months.  This desk should be hiring, not firing."**

145.    Bernstein replied**, "Well Doreen, you really need to ask yourself what you want.  You have been complaining about your compensation.  Don't think I haven't noticed or heard about your complaints."**

146.    Yoo then reminded Bernstein, **"My record is impeccable and I have done an excellent job with my team.  You've seen all the positive feedback sent from brokers saying what a great job I've done.  Why would you put me on the list?"**

147.    The following day unexpectedly, Roth approached Yoo.  Roth asked her if she would be interested in working for him in a new position available in the Risk Department.   The position with Roth was for "Head of Global Trade Surveillance."

148.    Yoo didn't want to leave Managed Accounts, but Yoo was under the impression that she was about to be terminated.  Yoo also thought that this might be a good opportunity to advance her career since Yoo was getting nowhere with Bernstein.

149.    On January 3, 2012, Yoo met with Roth and interviewed for the position.  Roth told her that he thought Yoo had all the qualifications for the job.  He also made her aware that there were other open positions available in his area.

150.    The same day, Bernstein was seen walking into Roth's office after 5:00 P.M. After that, Yoo never heard anything back from Roth about any of the positions.

151.    In and around February 2012, Yoo learned that the position she interviewed for was given to Pasquale (Patrick) Laino (a younger male).   One of the other two open positions in Roth's area were given to Kevin Chung, a former direct report of Yoo's, who transferred over from fixed income's "CD/ARPS" desk.  Another position was given to John Park.

### YOO IS DISCRIMINATELY TERMINATED WITHOUT NOTICE JUSTIFICATION, OR CAUSE

152.    On January 6, 2012, Yoo was terminated without notice, justification, or cause.

153.    Yoo was told to report to the second floor to meet with Bernstein and Paige Massie from HR.  Bernstein told her that her position had been eliminated (which in fact was not true).  Bernstein then left the room and Massey went over her severance package.

154.    Importantly, the very same day, Bernstein also terminated her trader Geoffrey Dennehy, age 48, who never had any disciplinary issues instead of Slaight or Wong who were more suitable candidates.  He was an exceptional employee with an impeccable record.

155.    Out of 75 Executive Directors in Capital Markets, Dennehy and Yoo, the lowest paid Executive Directors in GWMG Capital Markets fixed income trading, were the only two that were let go.  Not one other trading desk had terminated an Executive Director.

156.    Also, it was highly unusual for the firm to let go two employees from the same desk right before the migration of Smith Barney accounts were about to be integrated with the platform.

157.    When Bernstein's original plan to replace Yoo with Piekarz backfired, he decided to wait until the time was right and include her in a firm wide layoff, where it wouldn't look so obvious that he was trying to get rid of her.

158.    Dennehy would have been her replacement if he wasn't terminated, but after Yoo filed her complaint with HR regarding gender discrimination, Bernstein was careful not to replace her with a male manager.

159.    Later that day at 4:30 P.M., Bernstein held a meeting with the remaining traders on Yoo's team.  Bernstein told the desk that Cynthia Ghafari would be "replacing" Yoo and that she would be their new manager.

160.    Ghafari had been managing Capital Markets Marketing for the past five years. She did not have anywhere near the "nineteen" years experience that Yoo had in managed accounts.  Furthermore, as made clear by Bernstein, Yoo's position was not eliminated.

161.    Initially, MSSB stated that Ghafari was chosen to replace Yoo because she had an added responsibility of covering the ECN business which Yoo had much more experience in. However, that position was only given to Ghafari a few months prior to Yoo's termination and then shortly removed after Yoo was gone.

162.    All of the above allegations were originated from the actions of Bernstein in his authority and ability to hire, fire, promote and demote employees such as Yoo.  Bernstein should have known better than to engage in this discriminatory and inappropriate behavior.

163.    All of the previously demonstrated conduct by MSSB constitutes unlawful discrimination and retaliation against Yoo, expressing malicious and reckless disregard of her rights.

164.    All of the previously demonstrated conduct by MSSB was part of a pattern and practice of discrimination against women and other minority professionals imbedded in the culture of MSSB's Capital Markets Division.

### YOO'S LOSSES RESULTING FROM MSSB'S DISCRIMINATION AND RETAILIATION

165.    As a result of MSSB's discrimination and retaliation, Yoo suffered substantial loss of income and employment-related benefits.  During the course of her 21-year employment history, MSSB has paid Yoo less compensation than she would have received if she had not been subject to gender discrimination and retaliation.

166.    As a result of MSSB's discrimination and retaliation, Yoo suffered substantial harm to her reputation in the financial community, adverse effects on her career, diminished earning capacity, and substantial emotional harm and distress.

### YOO'S 2011 BONUS

167.    In respect of each year of her employment, Yoo (as well as similarly situated investment bankers like Yoo) considered her bonus (the "Bonus"), and not her base salary, to be a substantial portion of her total annual compensation.

168.    In 2010, MSSB increased base salaries, however the bonus component of compensation still was an important portion of  total compensation for Yoo.

169.    Yoo was paid for excellence and proven results; she was rewarded for her stellar performance, commitment and real contributions to the business.

170.    MSSB's refusal to pay a 2011 Bonus to Yoo is inconsistent with the firm's stated pay for performance culture especially after she performed for an entire fiscal year.

171.    Further, MSSB's refusal to pay a 2011 Bonus to Yoo is inconsistent with the total compensation of similar level MSSB employees who have also produced superlative performances in 2011 as Yoo has done.

172.    Accordingly, based upon Yoo's exemplary performance of her duties together with MSSB's' history of paying Yoo for her performance, Yoo is entitled to a 2011 Bonus of at least eighty five thousand ($85,000) dollars, however, her bonus should be reviewed to be in-line with what her similarly situated male colleagues' (who provided the same supervisory trading duties) received for their 2011 Bonuses.

173.    Throughout her career at MSSB, Yoo was compensated less than her male peers specifically in terms of her bonus compensation and total compensation.  Accordingly, Yoo's 2011 Bonus is equal to at least $85,000.

174.    To make matters worse, Plaintiff worked the entire fiscal year for 2011 and unquestionably earned her 2011 Bonus by achieving Defendant's business goals.

## LEGAL CLAIMS

## AS AND FOR A FIRST CAUSE OF ACTION

### SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964; 42 U.S.C.A. § 2000E

175.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

176.    Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's sex, female, and show an animus of sex bias.

177.    Defendants have undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under Title VII.

178.    These employment practices violate § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

179.    As a result of Defendant's actions, Plaintiff is unable to return to comparable employment.

180.    The aforementioned acts of Defendant constitutes unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

181.    As a proximate result of Defendant's aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

182.    As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

183.    As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

184.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary, future earnings, ~~and~~ bonuses, deferred compensation, pension, 401K, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

185.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendant.

186.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendant, jointly and severally, and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A SECOND CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF GENDER UNDER
### NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

187.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

188.    Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and show an animus of gender bias.

189.    As a result of Defendant's actions, Plaintiff is unable to return to comparable employment.

190.    The aforementioned acts of Defendant constitutes unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYSHRL § 296(1)(a).

191.    As a proximate result of Defendant's aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, pension, 401K and other employment benefits.

192.    As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

193.    As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

194.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, pension, 401K, costs, attorney's fees and prejudgment interest at no less than 9%.

195.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendant.

196.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing repeated pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A THIRD CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF GENDER UNDER
### NEW YORK CITY HUMAN RIGHTS LAW § 8-107

197.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

198.    Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and show an animus of gender bias.

199.    Defendant's animus towards Plaintiff's gender, female, is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

200.    As a result of Defendant's actions, Plaintiff is unable to return to comparable employment.

201.    The aforementioned acts of Defendant constitutes unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYCHRL § 8-107.

202.    As a proximate result of Defendant's aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, pension, 401K, deferred compensation and other employment benefits.

203.    As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

204.    As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

205.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, pension, 401K costs, attorney's fees and prejudgment interest at no less than 9%.

206.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendant.

207.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and

indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A FOURTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964;
### 42 U.S.C.A. § 2000E

208.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

209.   Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

210.   Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC.

211.   Defendant had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

212.   As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC, Defendant engaged in adverse treatment of Plaintiff, including, inter alia, demoting Plaintiff and terminating her employment.

213.   Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

214.   The aforementioned acts of Defendant constitute unlawful retaliation against Plaintiff in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

215.   As a proximate result of Defendant's aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, pension, 401K, deferred compensation and other employment benefits.

216.   As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

217.   As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

218.   As a result of the foregoing, Plaintiff is entitled to recover from Defendant, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, pension, 401k, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

219.   As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendant.

220.   In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and

indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR AN FIFTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

221.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

222.   Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendant were engaged in unlawful conduct under NYSHRL § 296 (1) (a).

223.   Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC.

224.   Defendant had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC.

225.   As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC, Defendant engaged in adverse treatment of Plaintiff, including, inter alia, demoting her and terminating her employment.

226.   As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

227.    The aforementioned acts of Defendant constitute unlawful retaliation against Plaintiff in violation of the provisions of NYSHRL § 296 (1) (a).

228.    As a proximate result of Defendant's aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

229.    As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

230.    As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

231.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, pension, 401k, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

232.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendant, jointly and severally, in addition to all other amounts sought herein.

233.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately

41

punish Defendant, jointly and severally, and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A SIXTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW § 8-107

234.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

235.    Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendant were engaged in unlawful conduct under NYCHRL § 8-107.

236.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC.

237.    Defendant had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

238.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC, Defendant engaged in adverse treatment of Plaintiff, including, inter alia, demoting her and terminating her employment.

239.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

240.    The aforementioned acts of Defendant constitute unlawful retaliation against Plaintiff in violation of the provisions of NYCHRL § 8-107.

241.    As a proximate result of Defendant's aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, pension, 401K, and other employment benefits.

242.    As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

243.    As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

244.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, pension, 401K, costs, attorney's fees and prejudgment interest at no less than 9%.

245.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendant.

246.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendant, jointly and severally, and to deter Defendant from continuing and repeating such conduct in the future.

## <u>AS AND FOR A SEVENTH CAUSE OF ACTION</u>

### BREACH OF CONTRACT

247.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

248.    As of the date of this Complaint, Defendant remains in material breach of contract in respect of Plaintiff's 2011 Bonus, as more fully described herein.

249.    Despite verbal and written demands, Plaintiff was not paid any portion of the earned 2011 Bonus duly owed to her.

250.    Plaintiff was not paid any portion of the 2011 Bonus, which is unprecedented by Defendant's policies, practices and procedures, despite a combination of:

      a.   the parties' express agreements;

      b.   the parties' prior and prospective conduct and course of dealings and payment to other similarly situated employees; and

      c.   numerous express verbal promises and representations made to and reasonably relied upon by Plaintiff by those agents of Defendant in authority during the course of Plaintiff's employment with Defendant.

251.    Plaintiff is unquestionably qualified to receive the Accrued Obligations promised to her, under the express conditions previously agreed to between Plaintiff and Defendant.

252.    Accordingly, Plaintiff is owed and entitled to receive an amount of at least **$85,000** in respect of her 2011 Bonus or at least in-line with her similarly situated male colleagues.

## ATTORNEY'S FEES AND COSTS

253.    Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Plaintiff, have in good faith, attempted to negotiate a reasonable resolution with Defendant without having to refer this matter to this forum for adjudication, determination and final resolution.

## PUNITIVE DAMAGES – BAD FAITH

254.    It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.  In light of Defendant's obvious and blatant bad faith, wrongdoing and breach of other duties, ***punitive damages*** should be assessed against Defendant so that they be deterred from attempting such harmful employment practices in the future.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.      An award of Plaintiff's actual damages in respect of loss of wages, promotional opportunities, including an award of front pay compensating Plaintiff for loss of future salary and benefits had her employment not been interfered with, including all to be earned salary and bonuses, pension, 401k, benefit payments, profit sharing, pension, 401K, costs, attorney's fees and prejudgment interest at no less than 9%;

II.     An award of compensatory damages in an amount to be determined at trial;

III.    An award of punitive damages in an amount to be determined at trial;

IV.     An award of at least $85,000 representing Yoo's 2011 Bonus;

V.      An order enjoining Defendant from engaging in the wrongful practices alleged herein;

VI.     An award of prejudgment interest, costs and attorney's fees; and

VII.    Such other and further relief that the Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury

on all questions of fact raised by the complaint.

Dated:        New York, New York
              June 16, 2015

                                        Respectfully submitted,


                                        **SACK & SACK LLP.**


                                               */s/ Jonathan Sack*
                                        By:    _____
                                               Jonathan Sack, Esq.  (JSS 1835)

                                        **Attorneys for Plaintiff**
                                        **DOREEN YOO**
                                        110 East 59th Street, 19th Floor
                                        New York, New York 10022
                                        Tel.: (212) 702-9000
                                        Fax: (212) 702-9702